982 So.2d 1110 (2005)
Stanley STEPHENS
v.
STATE of Alabama.
CR-02-0154.
Court of Criminal Appeals of Alabama.
August 12, 2005.
Rehearing Denied November 18, 2005.
*1116 T. Robin McIntyre, Dadeville, for appellant.
William H. Pryor, Jr. and Troy King, attys. gen., and Anne C. Adams, asst. atty. gen., for appellee.
WISE, Judge.
Stanley Stephens was convicted of capital murder in connection with the stabbing deaths of Annie Lamb Stephens and Nicholas Lance Stephens. The offense was made capital because there were multiple murders committed "by one act or pursuant to one scheme or course of conduct." See § 13A-5-40(a)(10), Ala.Code 1975. The jury recommended, by a vote of 10-2, that Stephens be sentenced to death. The circuit court accepted the jury's recommendation and sentenced Stephens to death.
The evidence presented at trial tended to establish the following. Annie Lamb Stephens and her husband, Stanley Stephens ("Stephens"), lived in a mobile home in the Lee County community of Smiths. During the early part of 1999, Annie and Stephens separated. Stephens continued to live in the mobile home, while Annie and the couple's three children  13-year-old Sherrie, Carman,[1] and 9-year-old Nicholas moved in with Annie's father, Earnest Perry, who lived nearby. Annie's sister, Dorothea Lamb, also lived nearby. Although Annie had moved out of the marital residence, she periodically returned to the residence to do laundry.
On the morning of August 2, 1999, Annie drove her automobile to the mobile home to wash several loads of clothes. Joan Thomas and her son, Nathaniel Thomas, lived across the road from the Stephenses' mobile home. That morning, Joan was standing in her yard when Annie drove up. The two women exchanged greetings, and Annie went inside with the laundry. Annie returned to her father's home in the early afternoon, dropped off the clean laundry, and then returned to the mobile home with additional dirty laundry. Nicholas followed his mother to the mobile home on his bicycle. Neither of them were ever seen alive again.
Approximately 30 minutes after Annie arrived at the mobile home with the second bundle of laundry, Stephens drove up to the mobile home in a blue automobile. At some point, Joan Thomas and her son Nathaniel saw Stephens standing outside the mobile home, near the mailbox. Nathaniel Thomas noticed that Stephens was drinking a beer. Around 4:00 p.m., Sherrie and Carman walked over to the mobile home. Stephens walked outside, holding a bottle of beer in his hand. He gave each of his daughters a hug and a kiss. However, when the girls started toward the doorway, as if to enter the mobile home, Stephens asked them if they had a friend's house they could go to. When they responded, "yes," Stephens told them to "go chill" with their friend.
Sherrie and Carman began walking toward a friend's house but turned around and went back to the mobile home. Sherrie knocked on the door. Stephens came to the door, but did not open it. He told the girls to go back to their grandfather's house and that their mother would be home in a little while. A short while later, the girls returned to the mobile home, to discover that the door was locked. Carman picked up her brother's bicycle and took it back to their grandparents' home. *1117 Sometime later, Sherrie and Carman saw Stephens come outside. Sherrie noticed that Stephens appeared "kind of nervous and shaky." Additionally, she noticed that her father had changed clothes. As he walked toward his car, Stephens pocketed a set of keys. As he drove away, Stephens told Sherrie that Annie and Nicholas had gone shopping with a friend. Sherrie wondered why her mother would go shopping without her purse and cellular telephone, both of which were at her grandfather's house.
Later that night, Stephens returned to the Perry house. He asked Sherrie to bring him a glass of water, which she did. Stephens stayed at the Perry house for only 5 to 10 minutes before driving away again. Worried that something had happened to their mother, Sherrie and Carman tried to stay awake, but eventually fell asleep.
Later that night, around 11:00 p.m., Stephens returned to the Perry house once again. He asked Earnest Perry for a "drink of liquor" and a cigarette to "calm his nerves." However, Stephens did not appear to be under the influence of alcohol at that time. Stephens also encountered Nathaniel Thomas, who was out walking. After asking for a cigarette, Stephens asked him if he wanted to get high and drink with him. He declined.
When Sherrie and Carman awoke the following morning, their mother had still not returned home. Around 11:30 a.m., the girls took their mother's purse and cellular telephone and went down the road to their aunt's house. They attempted to telephone Annie at work, but were told that she had not come in that day. The girls then walked to the Stephenses' mobile home, but the doors were locked and they were unable to get inside.
As Sherrie and Carman searched for their mother, Stephens pulled into Rubin Jones's driveway. Jones's house was approximately five minutes from the Stephenses' mobile home. Rubin Jones, his daughter Lori Jones, Matthew Cooper, and Abraham Colquitt were outside in the front yard when Stephens drove up. Stephens got out of his car and asked for a cigarette. Lori Jones asked Stephens, "How's Annie?" Stephens replied, "Dead." Taken aback, Lori stated, "Well, you must have killed her." Stephens nodded affirmatively and began crying. Stephens said that he wanted to turn himself in to the police, and Lori went inside and telephoned 911 for emergency assistance. While Lori was inside telephoning for assistance, Stephens pulled a knife out of his pants pocket and said that he had stabbed Annie. Stephens tried to give the knife to Cooper, but Cooper refused to touch it. Stephens then put the knife back in his pocket.
Moments later, Deputy Scott Stover of the Lee County Sheriff's Department arrived at the Jones's house. As Deputy Stover got out of his patrol car and walked toward the house, a man stated, "the person you need to see is coming," indicating Stephens. Deputy Stover saw Stephens place his hands behind his back. Deputy Stover noticed that Stephens appeared to be "real sad." For his safety, Deputy Stover performed a brief pat-down search of Stephens and discovered a knife in his pants pocket.
Stephens attempted to tell Deputy Stover what had happened, but Stover told Stephens not to say anything more until after he had been advised of his rights. Deputy Stover then informed Stephens of his Miranda[2] rights and made sure that Stephens understood those rights. Stephens *1118 indicated that he understood his rights. Stephens then told Deputy Stover that he had killed his wife; he also told Stover where his wife's body was located. Deputy Stover notified the sheriff's department and requested that another unit investigate the address Stephens had given him.
Two patrol units responded to the report of a possible homicide at the Stephenses' mobile home. Deputies Linda Ferrell and Russell Bledsole arrived at the mobile home first; seconds later, Deputy Keith Jordan arrived. The deputies knocked on the doors and windows of the mobile home  trying to get a response  to no avail. Finally, Deputy Jordan kicked in the back door. Upon entry, Deputy Jordan and Deputy Bledsole found the bodies of Annie Stephens and her nine-year-old son Nicholas on the floor of the living room. The deputies secured the scene, notified the sheriff's department of what they had discovered, and waited for the homicide investigators to arrive. Homicide investigators arrived and began to process the crime scene. The bodies of Annie and Nicholas were lying near each other on the living room floor; Nicholas's arm was lying across his mother's head. The living room was in a state of disarray-furniture was overturned and clothes were strewn about. There were blood splatters on the walls, the curtains, the sofa, and a rocking chair. The kitchen was in a similar state of disarray. Drawers and cabinet doors were standing open; various kitchen implements  including a number of knives  were found on the floor and counters. Additional blood splatters were found in the kitchen  evidence of a struggle  as well as a trail of blood leading from the living room into the kitchen.
Annie's partially clothed body was found facedown on the living room floor. There was a cushion under the lower half of her torso, and her panties had been removed. When investigators removed the towel that covered her head, they discovered a belt looped and fastened around her neck. There were 30 cut and stab wounds to her chest, back, face, hands, and arms  resulting in massive blood loss. Several of the chest wounds had pierced her lungs and heart. Her right breast was almost severed from the body. There was severe bruising to her face and neck, indicating that the belt had been put around her neck and the blows to her face had been administered before her death. Dr. Gregory Wanger, a state medical examiner, testified that the cause of death was multiple stab wounds.
Nicholas's body was clothed in a blood-soaked T-shirt. There were 37 cut and stab wounds to his chest, neck, and arms. Several of the chest wounds had pierced his lungs, heart, liver, and stomach. Additionally, the wound to his neck was so deep that it exposed the underlying tissue. Dr. Wanger testified that Nicholas's cause of death was "multiple sharp force injuries."
Stephens's defense counsel rested without putting on any evidence. After both sides had rested and the trial court had instructed the jury on the applicable law, the jury determined that the murders of Annie and Nicholas Stephens had been committed pursuant to a common scheme or plan, and it convicted Stephens of capital murder.
During the penalty phase of Stephens's trial, the State resubmitted all of the evidence it had introduced during the guilt phase, including Stephens's 1992 guilty-plea conviction for second-degree assault arising out an incident wherein he had shot his wife, Annie Lamb Stephens, in the face and chest with a shotgun.
Stephens offered the testimony of several witnesses during the penalty phase. Lizzie Perry, Stephens's mother, testified *1119 that she had raised her son to be a loving, obedient child. Perry testified that her son's second-degree assault conviction had come during a time when he was "running with the wrong crowd." She testified that Stephens loved his children and that he could not have been in his "right mind" when he killed Annie and Nicholas. Donna Ferguson, a school counselor and neighbor of the Stephens family, testified that before this incident, Stephens had always appeared to be a responsible parent. Ferguson testified that she was concerned about the effect Stephens's trial would have on his daughters, Sherrie and Carman.
Stephens also offered the testimony of Dr. Catherine Boyer, a forensic psychologist, and Dr. Gregory Skipper, a physician board-certified in addiction medicine. Dr. Boyer testified that she had met with Stephens on four separate occasions after the incident in order to evaluate his mental condition. Dr. Boyer determined that Stephen's IQ was below average, that his verbal IQ was 73 and his performance IQ was 86, resulting in a full-scale IQ of 77. In Dr. Boyer's opinion, Stephens was not suffering from an antisocial personality disorder. Nor had Stephens's use of crack cocaine resulted in significant criminal activity. However, Dr. Boyer testified that Stephens's use of crack cocaine would have increased his tendency toward aggression at the time of the offense. Dr. Boyer testified that the nature of the crime itself suggested that Stephens was suffering from a significant mental or emotional disturbance at the time he killed Annie and Nicholas.
Dr. Skipper testified that the use of crack cocaine for long periods can result in decreased mental function. Dr. Skipper testified that the tests he administered to Stephen indicated that Stephens was addicted to crack cocaine. Using crack cocaine, he testified, could result in a psychotic state where a person could do something and "not even realize that [he was] doing it." However, Dr. Skipper acknowledged, there was no way of knowing whether Stephens was under the influence of crack cocaine at the time he killed Annie and Nicholas because no forensic testing had been done.
After both sides had rested and the trial court instructed the jury on the law applicable to the penalty phase, the jury returned an advisory verdict recommending that Stephens be sentenced to death.

Standard of Review
In every case in which the death penalty is imposed, this Court must review the record for any plain error, i.e., for any defect in the proceedings, whether or not the defect was brought to the attention of the trial court. Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
As this Court stated in Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001):
"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affect[s] the *1120 fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Although Stephens's failure to object at trial will not preclude this Court from reviewing an issue in this case, it will, nevertheless, weigh against any claim of prejudice he makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

Guilt-Phase Issues

I.
Stephens argues that the trial court erred in denying his request for a continuance. Specifically, Stephens argues that his trial should have been continued until such time as a third round of DNA testing could be performed on the knife seized from Stephens on August 3, 1999.
When Stephens was arrested on August 3, 1999, law-enforcement officials seized a knife found in a pocket of Stephens's pants. The knife had blood on it. Samples of the blood  and other items  were submitted to the Alabama Department of Forensic Sciences for DNA analysis. However, because of a delay in testing caused by a backlog of cases, the evidence in Stephens's case had not been tested as of April 3, 2001, and on that date the State and Stephens's defense counsel asked the trial court to authorize funding for independent DNA testing of the blood on the knife and other evidence to prevent further delays. The trial court granted the joint request, and on April 3, 2001, entered an order authorizing funding for independent testing by LabCorp, a North Carolina testing facility. DNA testing of the blood found on the knife taken from Stephens's pocket identified the blood as belonging to Nicholas Stephens. In April 2002, the Department of Forensic Sciences performed a DNA analysis of the blood samples, which confirmed LabCorp's 2001 findings that the blood found on the knife was that of Nicholas Stephens.
It is well settled that a motion for a continuance is addressed to the sound discretion of the trial court and that, absent a showing of abuse of that discretion, the trial court's decision on such a motion will not be overturned on appeal. See, e.g., Smith v. State, 797 So.2d 503, 523 (Ala. Crim.App.2000), cert. denied, 797 So.2d 549 (Ala.2001), cert. denied, 534 U.S. 962, 122 S.Ct. 371, 151 L.Ed.2d 282 (2001); Arthur v. State, 711 So.2d 1031, 1069 (Ala. Crim.App.1996), aff'd, 711 So.2d 1097 (Ala. 1997).
"`The guidelines for determining whether a trial court has abused its discretion in denying a continuance are set out in Ex parte Saranthus, 501 So.2d 1256, 1257 (Ala.1986):
"`"A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973). If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability *1121 that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence. Knowles v. Blue, 209 Ala. 27, 32, 95 So. 481, 485-86 (1923)."'
"Fortenberry v. State, 545 So.2d 129, 138 (Ala.Cr.App.1988)."
Ex parte Clark, 728 So.2d 1126, 1134 (Ala. 1998).
Stephens's trial was scheduled to begin on August 26, 2002. On July 17, 2002, defense counsel filed a motion seeking a third round of DNA testing on the knife. Subject to certain conditions, the trial court granted the requested funds for additional testing by ReliaGene, a facility based in New Orleans, Louisiana. The condition imposed by the court was that it would allow a third round of testing only if Stephens agreed to stipulate to the earlier DNA test results. The court noted that it did not want to get into a situation where a continuance had to be granted during trial because the test results were not received in time. Stephens agreed to stipulate to the prior DNA results if the evidence sent to ReliaGene was not returned by the time his trial began. Despite this agreement, after the State rested, Stephens requested a continuance because the DNA results on the tests performed by ReliaGene were not yet available. Given that defense could state only that it hoped the additional testing would show that the blood on the knife was not that of Nicholas Stephens, the trial court denied Stephens's request for a continuance. However, the court noted, in the event that the DNA test results differed from the two earlier tests, defense counsel would be allowed to revisit this issue in a posttrial motion. When the test results were received from ReliaGene, the State stipulated on the record that the ReliaGene test results reached the same conclusion as reached by the two previous tests  that the blood on the knife belonged to Nicholas Stephens. Because the test results were merely cumulative of the two previous test results, the trial court did not abuse its discretion in denying Stephens's request for a continuance based on the fact that ReliaGene's results were not yet available. See Martin v. State, 931 So.2d 736 (Ala.Crim.App.2003), aff'd in part, rev'd in part on other grounds, 931 So.2d 759 (Ala. 2004).

II.
Stephens next argues that the trial court erred in denying his motion to suppress and admitting into evidence that statement he gave to law-enforcement officials on August 3, 1999.
It has long been the law that a confession is prima facie involuntary and inadmissible and that, before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a Miranda predicate. Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App. 1990). A two-pronged test is used to determine whether an accused's statement is admissible. First, the trial court must determine whether the accused was informed of his Miranda rights before he made the statement. Second, the trial court must determine whether the accused voluntarily and knowingly waived his Miranda rights before making his statement. Holder v. State, 584 So.2d 872, 878 (Ala.Crim.App. 1991); Carpenter v. State, 581 So.2d 1277, 1278 (Ala.Crim.App.1991).
In order for a statement to be admissible, "[t]he trial judge need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made." Jackson v. State, 516 So.2d 726, 741 (Ala.Crim.App.1985), citing Harris v. State, 420 So.2d 812, 814 (Ala. Crim.App.1982) (emphasis added). See *1122 also Ex parte Williams, 627 So.2d 999, 1003 (Ala.1993). Moreover, in cases involving conflicting evidence on the issue of voluntariness, the trial court's determination is entitled to great weight on appeal. D.M.M. v. State, 647 So.2d 57, 60 (Ala. Crim.App.1994). "`"Where the evidence of voluntariness is conflicting, and even where there is credible testimony to the contrary, the trial judge's finding of voluntariness must be upheld unless palpably contrary to the weight of the evidence."'" Dixon v. State, 588 So.2d 903, 908 (Ala. 1991) (quoting Carr v. State, 545 So.2d 820, 824 (Ala.Crim.App.1989)) (emphasis added). See also Jackson v. State, 836 So.2d 979, 982 (Ala.2002).
If the first prong of the test is met, the court must then determine whether, after having been informed of his rights, the accused made a knowing and voluntary waiver of those rights. Stephens's argument appears to be premised on four grounds: (1) that his statement was involuntary because he did not sign a waiver before giving the inculpatory statement; (2) that he was somehow coerced into making a statement because Deputy Stover had his weapon drawn when he made the statement; (3) that he lacked the mental capacity to waive his right against self-incrimination freely and voluntarily; and (4) that he was arrested and interrogated without probable cause.
The fact that Stephens did not execute a written waiver before making his statement did not bar its admission into evidence. This Court has held that "`[a] finding of voluntariness may be made even where a suspect refuses to sign a waiver of rights form.'" Mack v. State, 500 So.2d 489, 493 (Ala.Crim.App.1986) (quoting Proctor v. State, 391 So.2d 1092, 1094 (Ala. Crim.App.1980)). Here, it is readily apparent that Stephens wanted to tell Deputy Stover what had happened. Indeed, out of an abundance of caution, Deputy Stover prevented Stephens from telling him what had happened until after he advised him of his Miranda rights. Thus, there is no merit to this claim.
There is likewise no merit to Stephens's claim that he had been coerced into confessing because Deputy Stover had his weapon drawn when he approached Stephens. Deputy Stover testified that he got out of his patrol car with his weapon drawn because he was responding to a call involving a possible murder suspect who was still armed. Deputy Stover testified that he never pointed the weapon at Stephens. Further, he testified that because he determined almost immediately that Stephens did not pose an imminent threat, he holstered his weapon seconds after getting out of his patrol car. Accordingly, this claim must also fail.
Stephens claim that his below-average IQ prevented him from making a knowing and voluntary waiver of his rights. Stephens was examined by two mental-health professionals. Stephens's full-scale IQ was determined to be 77, falling within the range of borderline intellectual functioning. "Having a low IQ will not render a waiver ineffective unless the individual's IQ is so low that the person attempting to waive his rights absolutely cannot understand his Miranda rights." Dobyne v. State, 672 So.2d 1319, 1337 (Ala. Crim.App.1994) (citing Arnold v. State, 448 So.2d 489 (Ala.Crim.App.1984)). Here, both experts testified that Stephens understood his Miranda rights. Accordingly, there is no basis on which to conclude that Stephen's IQ was so low that he could not understand his rights.
Finally, Stephens claims that he was arrested and interrogated without probable cause. Because this claim is raised for the first time on appeal, we *1123 review this claim under the plain-error doctrine.
"`In making a determination as to whether probable cause to arrest exists, "it is simply necessary that there exist a probability that a crime has been committed and that the person to be arrested committed it." W. LaFave, [1 Search and Seizure], at § 3.7 [(2d ed.1987)]. See also W. LaFave, 1 Search and Seizure, § 3.1(b) (2d ed.1987).'" Doggett v. State, 791 So.2d 1043, 1057 (Ala.Crim.App.2000) (quoting State v. Mathews, 597 So.2d 235, 237 (Ala. Crim.App.1992)). Here, Deputy Stover responded to a call involving a potential murder suspect. When he arrived, Stephens placed his hands behind his back and began walking toward Stover "with a sad look on his face." Indeed, Stephens was so anxious to talk that Deputy Stover had to tell him to be quiet so that he could advise him of his Miranda rights. Stephens indicated that he understood his rights, and then  with no prompting from Stover  stated that he had killed his wife. Given these circumstances, no Miranda violation occurred.
This Court will not disturb a trial court's decision on a motion to suppress a confession based on voluntariness unless its decision "`"`is manifestly contrary to the great weight of the evidence.'"'" Whitehead v. State, 777 So.2d 781, 820 (Ala. Crim.App.1999), aff'd, 777 So.2d 854 (Ala. 2000) (quoting Maples v. State, 758 So.2d 1, 41 (Ala.Crim.App.1999), quoting other cases). Based on the totality of the circumstances, the trial court correctly determined that Stephens's statement was voluntary. Thus, the court properly allowed Stephens's statement to be admitted into evidence.

III.
At trial, the State elicited testimony from Earnest Perry, the father of Annie Lamb Stephens, regarding an argument between his daughter and Stephens that culminated in Stephens's shooting Annie in the face and chest, resulting in Stephens's conviction for second-degree assault. The State then offered proof of Stephens's 1992 conviction for second-degree assault. Stephens argues that the trial court erred by allowing Perry to testify regarding a collateral bad act because, he says, such evidence violated the general exclusionary rule of Rule 404(b), Ala. R.Evid. Specifically, he contends that this evidence was not probative of any issue at trial, that it was offered solely to establish his bad character, that it did not fall within an exception to the exclusionary rule, and that the probative value of the evidence was outweighed by its potential prejudicial effect. He further argues that such evidence irreparably prejudiced his defense and tainted his trial, thus violating his constitutionally guaranteed right to a fair trial. The State argues that evidence of Stephens's 1992 conviction is admissible under several of the exceptions to the general exclusionary rule. However, we will address only those exceptions that we find applicable to this case.
"The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with regard to the admission of collateral-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App. 1998). Moreover, "`[a] trial court will not be placed in error for assigning the wrong reason for a proper ruling, if that ruling is correct for any reason.'" Peraita v. State, 897 So.2d 1161, 1183 (Ala.Crim.App.2003), aff'd, 897 So.2d 1227 (Ala.2004) (quoting Nicks v. State, 521 So.2d 1018, 1030-31 *1124 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)).
Rule 404(b), Ala.R.Evid., provides:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."
Before the effective date of Rule 404(b)  January 1, 1996  the exclusionary rule was explained and followed by the Alabama courts. The adoption of Rule 404(b) did not abrogate prior caselaw on this topic. Hunter v. State, 802 So.2d 265 (Ala.Crim.App.2000), cert. denied, 802 So.2d 273 (Ala.2001). We note that the Alabama Supreme Court's decision in Ex parte Casey, 889 So.2d 615 (Ala.2004), while tightening the use of Rule 404(b) evidence to prove identity, did not prohibit the use of such evidence. Although Ex parte Casey addresses the admissibility of Rule 404(b) evidence in broad terms, we note that it is factually distinguishable in that Casey was charged with receiving stolen property, not homicide. Moreover, the Supreme Court in Ex parte Casey found the limiting instruction to be deficient, unlike the trial court's limiting instruction in this case. Finally, the collateral bad acts involved different victims, not the same victim, as was the case here.
Alabama law has long recognized the admissibility of prior acts of hostility or abuse toward a victim in a prosecution where the defendant is charged with killing the individual at whom those acts were directed. We have held that:
"`"In a prosecution for murder, evidence of former acts of hostility between the accused and the victim are admissible as tending to show malice, intent, and ill will on the part of the accused." White v. State, 587 So.2d 1218, 1230 (Ala.Cr.App.1990), affirmed, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).' Childers v. State, 607 So.2d 350, 352 (Ala.Cr.App.1992). `Acts of hostility, cruelty and abuse by the accused toward his homicide victim may be proved by the State for the purpose of showing motive and intent. . . . This is "another of the primary exceptions to the general rule excluding evidence of other crimes."' Phelps v. State, 435 So.2d 158, 163 (Ala.Cr.App.1983). See also Baker v. State, 441 So.2d 1061, 1062 (Ala.Cr.App.1983)."
Hunt v. State, 659 So.2d 933, 939 (Ala. Crim.App.1994). See Harris v. State, 489 So.2d 688 (Ala.Crim.App.1986) (prior acts of abuse toward child victim were admissible to show motive and intent to murder).
"The testimony concerning the appellant's other prior bad acts against the victim and her brother was also admissible as exceptions to the exclusionary rule. Evidence of these other bad acts was not admitted to show the appellant's bad character, but rather was admissible under the motive, intent, and common plan or scheme exceptions to the exclusionary rule.
"`"In a prosecution for murder, evidence of recent abuse to the child by the accused is admissible to show intent, motive or scienter.' . . . Acts of hostility, cruelty, and abuse by the accused toward his homicide victim *1125 may be proved by the State for the purpose of showing motive and intent. . . . This is `another of the primary exceptions to the general rule excluding evidence of other crimes.'" Phelps v. State, 435 So.2d 158, 163 (Ala.Cr.App.1983) (citations omitted). See also Baker v. State, 441 So.2d 1061, 1062 (Ala.Cr.App.1983).'
"Eslava v. State, 473 So.2d 1143, 1146 (Ala.Cr.App.1985). See also Burkett v. State, 439 So.2d 737, 748-49 (Ala.Cr. App.1983)."
Harvey v. State, 579 So.2d 22, 26 (Ala. Crim.App.1990). Despite the holding in Ex parte Casey, the above-referenced cases remain good law. Indeed, we are aware of no Alabama case which prohibits evidence concerning acts of hostility or abuse in order to establish motive when those acts are committed against the same victim that the accused is subsequently charged with killing.[3]
Stephens argued at length, both in oral argument to this court and in his brief, that this Court's decision in Brewer v. State, 440 So.2d 1155 (Ala.Crim.App.1983), mandates that his conviction be reversed. After a careful examination of our decision in Brewer, we conclude that Brewer is factually distinguishable from the case at bar. Brewer involved a defendant convicted of murdering a young white crippled woman. The victim's body was found by a fisherman under a bridge across the Sipsey River in Tuscaloosa County. When found, the victim  who had died of strangulation  was nude; her neck and left wrist were bound with handkerchiefs, her ankles were tied together with a brassiere, and she was wearing one sandal. Brewer told investigators that he had sold the victim a stereo, and, at the victim's request, he had gone to the victim's apartment on the night before her body was found to determine why the stereo was not working. According to Brewer, he then left the victim's apartment and went home. Although Brewer denied that the victim had ever been in his car, a search of his vehicle revealed that samples of hair on the trunk mat exhibited the same characteristics as known hair samples taken from the victim's body. Fragments of hair matching the victim's were also discovered on a roll of black electrician's tape found in the trunk of Brewer's car.
At trial, the State offered evidence that eight years earlier, Brewer had been convicted of assaulting another young white female; the victim testified she had dated Brewer, a coworker, a few times. One night, as she was returning from work, Brewer's car passed hers on the highway. Brewer pulled into a church parking lot, and that she followed him into the parking lot and parked her car next to his. The victim testified that Brewer walked over to her car, opened the door, told her to move over, and put a knife to her throat. Brewer then choked the victim with an extension cord and struck her on the head with an unknown object, causing her to lose consciousness. When she regained consciousness, the victim was fully clothed, but was wearing just one shoe. A roll of *1126 white adhesive tape was found on the ground at the scene.
The trial court admitted the testimony of the assault victim, giving a limiting instruction that the jury was to consider the assault victim's testimony solely for the purpose of establishing identity and intent or motive.
On appeal, Brewer argued that the trial court erred in admitting evidence of the prior assault, contending that the previous conviction was not admissible under any of the exceptions to the general exclusionary rule. This Court agreed, and reversed Brewer's conviction, holding:
"[T]he first assault provides no inference as to what `moving power' may have `led [appellant's] mind to desire [the death of the victim] and [to] form the purpose [to kill her]' If anything, the two crimes can both be termed `senseless' precisely because they appear to be devoid of motive. . . .
"Because appellant's prior assault provides no logical link to the reason for his second crime, we do not believe the evidence in question was relevant on the issues of motive or malice. Something less speculative than `appellant's mark of no motive' is required in order for the jury to infer from the commission of the first crime that appellant was guilty of the second."
440 So.2d at 1160.
In Brewer, the incidents involved different offenses, different victims, and different locations. Indeed, virtually the only similarities between the two incidents were that both victims had been choked and were found wearing just one shoe, hardly the type of evidence that would lend itself to proving motive, intent, or identity. By contrast, this case involved Stephens's prior act of violence toward the same victim, thus providing a "logical link" to the reason for his second crime  his rage toward his estranged wife, Annie Lamb Stephens. Based on the particular facts of this case  including the fact that defense counsel tacitly acknowledged that evidence of the 1992 conviction was admissible to prove motive and intent  we conclude that the broad holding in Ex parte Casey does not prohibit the admission in this case of evidence concerning Stephens's 1992 conviction for second-degree assault, given that he was being tried for the murder of his wife  the same victim he was convicted of assaulting in 1992.
In Robinson v. State, 528 So.2d 343 (Ala. Crim.App.1986), this Court discussed the purpose of the exclusionary rule, stating:
"`"On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question."' Pope v. State, 365 So.2d 369, 371 (Ala.Cr.App. 1978), quoting C. Gamble, McElroy's Alabama Evidence § 69.01 (3d ed.1977). `"This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors."' Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting McElroy's supra, § 69.01(1). Thus, the exclusionary rule serves to *1127 protect the defendant's right to a fair trial. `"The jury's determination of guilt or innocence should be based on evidence relevant to the crime charged."' Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983); Terrell v. State, 397 So.2d 232, 234 (Ala.Cr.App.1981), cert. denied, 397 So.2d 235 (Ala.1981); United States v. Turquitt, 557 F.2d 464, 468 (5th Cir.1977).
"`If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible.' Saffold v. State, 494 So.2d 164 (Ala. Cr.App.1986). The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Willis v. State, 449 So.2d 1258, 1260 (Ala.Cr.App. 1984); Scott v. State, 353 So.2d 36 (Ala. Cr.App.1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. `"Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects."' Averette v. State, 469 So.2d 1371, 1374 (Ala. Cr.App.1985), quoting United States v. Turquitt, supra at 468-69. `"`Prejudicial' is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial." [Citation omitted.] "Of course, `prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.'"' Averette v. State, supra, at 1374."
528 So.2d at 347. See also Hocker v. State, 840 So.2d 197, 213-14 (Ala.Crim. App.2002).
Evidence of Stephens's 1992 conviction for second-degree assault was admissible under the motive exception to the general exclusionary rule.
Evidence tending to establish motive is always admissible. Perkins v. State, 808 So.2d 1041, 1084 (Ala.Crim.App. 1999), aff'd, 808 So.2d 1143 (Ala.2001), vacated on other ground, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). See also 1 Charles W. Gamble, McElroy's Alabama Evidence § 70.01(12)(e) (5th ed.1996). In discussing motive, the Alabama Supreme Court has stated:
"`Motive is an inducement, or that which leads or tempts the mind to do or commit the crime charged.' Spicer v. State, 188 Ala. 9, 26, 65 So. 972, 977 (1914). Motive is `that state of mind which works to "supply the reason that nudges the will and prods the mind to indulge the criminal intent."' C. Gamble, Character Evidence, [A Comprehensive Approach (1987)] at 42. `Furthermore, testimony offered for the purpose *1128 of showing motive is always admissible. It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.' (Emphasis in original, citations omitted.) Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988)."
Ex parte Register, 680 So.2d 225, 227 (Ala. 1994). "If the prior bad act falls within [the motive] exception, and is relevant and reasonably necessary to the State's case, and the evidence that the accused committed that act is clear and conclusive, it is admissible." Boyd v. State, 715 So.2d 825, 838 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
It has long been the rule in Alabama that former acts of cruelty, hostility, or violence by the accused toward the victim are admissible in order to establish a motive to commit the charged homicide. See, e.g., Bennefield v. State, 281 Ala. 283, 202 So.2d 55 (1967) (evidence of husband's prior assaults on wife admissible to establish motive in prosecution for murder because acts "tended to show ill feeling between the parties"); Patterson v. State, 243 Ala. 21, 8 So.2d 268 (1942) (proof that husband had previously been convicted of assaulting his wife admissible to establish motive in prosecution for murder); Doane v. State, 351 So.2d 648, 653 (Ala.Crim.App. 1977) (testimony concerning premarital fight between defendant and victim admissible to establish motive and malice in prosecution for manslaughter). Indeed, Professor Gamble has noted:
"One of the most common cases where motive is shown is that where the wife allegedly is murdered by the husband. In these cases a whole host of circumstances, existing between the two parties, are admitted for the purpose of showing that one spouse had a motive for killing the other.
"Former acts of hostility or cruelty by the accused upon the victim are very commonly the basis for the prosecution's proof that the accused had a motive to commit the charged homicide."
1 C. Gamble, McElroy's Alabama Evidence § 45.01(8).
Here, evidence was admitted concerning a history of marital difficulties between Stephens and Annie. As a result, Annie and the couple's three children had moved out of the marital residence several months earlier and were living with Annie's father at the time the homicides occurred. Although Annie returned to the couple's mobile home to do laundry, she did so when Stephens was not present, most likely to avoid a confrontation. Annie's father testified that in 1992 Stephens had shot Annie following an argument, resulting in his conviction for second-degree assault. During closing argument, the State argued that the evidence demonstrated that Stephens's motive for killing Annie was in all likelihood rage. Thus, evidence of the 1992 shooting was admitted to support the State's theory that Stephens had stabbed his wife in a fit of rage, following an argument or some other type of confrontation.
Evidence of the 1992 conviction was likewise admissible under the intent exception to the general exclusionary rule.
Addressing the admissibility of collateral-act evidence pursuant to the intent exception, Professor Gamble has written:
"If the accused is charged with a crime that requires a prerequisite intent, collateral crimes, acts or misconduct are admissible to show that the accused possessed the necessary intent. This rule is based upon the theory that because the unintentional doing of an act *1129 is abnormal and unusual, the more a person does other acts similar to the act in question, the greater the likelihood that the act in question was not done inadvertently. Whether the collateral act has a tendency to show that the accused did possess the prerequisite state of mind is, of course, one of relevancy vested largely in the discretion of the trial court."
1 C. Gamble, McElroy's Alabama Evidence § 69.01(5) (footnotes omitted).
Stephens was charged with the intentional murder of two or more people by one act or pursuant to a one scheme or course of conduct. Although Stephens contends that intent was not at issue, the evidence indicates otherwise. Indeed, Stephens himself placed intent at issue by presenting evidence of alleged drug use and intoxication in an attempt to establish a lack of intent. Further, he requested that the jury be charged on the issue of intoxication; the trial court granted Stephens's request. Because Stephens elected to place intent as issue, the State was entitled to offer evidence of Stephens's 1992 conviction to establish intent as charged in the indictment.
Stephens also argues that the probative value of the evidence of his 1992 conviction was substantially outweighed by the danger of unfair prejudice.
Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Ala.R.Evid. "All relevant evidence is admissible, except as otherwise provided. . . ." Rule 402, Ala. R.Evid. Rule 403, Ala.R.Evid., provides:
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
In Hayes v. State, 717 So.2d 30, 37 (Ala.Crim.App.1997), this Court stated:
"The power to make this determination is vested in the trial court. Zielke v. AmSouth Bank, 703 So.2d 354, 361 (Ala. Civ.App.1996); see also C. Gamble, Gamble's Alabama Rules of Evidence § 403. We will not disturb such a determination unless it is clearly an abuse of discretion."
Evidence of Stephens's collateral bad act does not fit neatly into a single recognized exception. Rather, it spills over into two of the recognized exceptions-motive and intent. Nevertheless, evidence of Stephens's collateral bad act may be admissible if that evidence is relevant to the issues presented and if its probative value outweighs any prejudicial effect that that evidence might have. In Nicks v. State, 521 So.2d 1018, 1025-26 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), this Court wrote:
"Alabama law provides for the admissibility of evidence of collateral crimes or acts as part of the prosecution's case-in-chief if the defendant's collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty because of his past misdeeds. Brewer v. State, [440 So.2d 1155 (Ala.Crim.App.1983)]. Numerous Alabama cases list the exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted. . . . All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is *1130 relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Noble v. State, 253 Ala. 519, 45 So.2d 857 (1950).
"`All evidence is relevant which throws, or tends to throw, any light upon the guilt or the innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove, that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime, or may establish some collateral and unrelated fact. Evidence of other acts to be available must have some logical connection and reveal evidence of knowledge, design, plan, scheme, or conspiracy of the crime charged; or circumstantial evidence of identity of the person charged with the crime; or tends to corroborate direct evidence admitted.'
"Underhill, Criminal Evidence § 154 (3d ed.1923). If the evidence is not so remote as to lose its relevancy, the decision to allow or not allow evidence of collateral crimes or acts as part of the State's case-in-chief rests in the sound discretion of the trial judge. McGhee v. State, 333 So.2d 865 (Ala.Cr.App.1976); McDonald v. State, 57 Ala.App. 529, 329 So.2d 583 (1975), writ quashed, 295 Ala. 410, 329 So.2d 596 (1976), cert. denied, 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99 (1976)."
As previously stated, probative evidence of collateral bad acts may be excluded only when the evidence is "unduly and unfairly prejudicial." Here, evidence concerning Stephens's 1992 conviction was relevant, was not admitted simply to prove Stephens's bad character, and was more probative on the issue of guilt than it was prejudicial to his defense. Accordingly, the court did not abuse its discretion in admitting evidence of Stephens's 1992 conviction for second-degree assault.
Stephens also makes a sweeping claim of a due-process violation because, he says, admission of Earnest Perry's testimony concerning Stephens 1992 conviction for second-degree assault "deprived him of a full and fair trial in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and under Article I, Section 6 of the Constitution of Alabama."
Rule 105, Ala.R.Evid., states, in pertinent part:
"When evidence which is admissible for one purpose but not admissible . . . for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."
Even before the effective date of Rule 105, this Court had encouraged trial judges to give limiting instructions when evidence of a collateral bad act or uncharged misconduct is admitted for a limited purpose. See, e.g., Malone v. State, 659 So.2d 1006, 1009 (Ala.Crim.App.1995).
Here, the trial court instructed the jury on the proper use of collateral-act evidence at the time Perry's testimony was offered. Moreover, the court gave a second limiting instruction as part of its jury charge at the conclusion of the guilt phase of Stephens's trial. Jurors are presumed to follow the judge's instructions. Taylor v. State, 666 So.2d 36, 70 (Ala.Crim.App.), on return to *1131 remand, 666 So.2d 71 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). The trial court's limiting instructions were proper and sufficient in this case. See Snyder v. State, 893 So.2d 482, 486-87 (Ala.2001).
Under these circumstances, neither Rule 404(b) nor Ex parte Casey prohibits admission of the collateral-act evidence. Because the collateral-act evidence concerning Stephens's 1992 conviction for second-degree assault was properly admitted under the motive and intent exceptions to the general exclusionary rule, we cannot say that the trial court abused its discretion in admitting Earnest Perry's testimony.

IV.
Stephens argues that the trial court erred by admitting into evidence various photographs of the victims. Specifically, he contends that admission of the photographs irreparably prejudiced his defense and tainted his trial, given that "[t]he only purpose for which the photographs were offered was to inflame the jury" . . . and that "the deaths of the victims were undisputed." (Stephens's brief, p. 23.)
"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984)."
Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989). Accord Ex parte Loggins, 771 So.2d 1093, 1104 (Ala.2000); Moody v. State, 888 So.2d 532, 586 (Ala.Crim.App. 2003), cert. denied, 888 So.2d 605 (Ala. 2004).
Here, the trial court carefully considered each of the photographs the State offered as evidence. Although a substantial number of the photographs were ultimately admitted into evidence, the court excluded several photographs it deemed to be unduly prejudicial or cumulative of other photographs already admitted. We have likewise reviewed the photographs, and we conclude that they were relevant to depict the crime scene and the injuries suffered by each of the victims. "Photographs that depict the crime scene are relevant and therefore are admissible." Wilson v. State, 777 So.2d 856, 929 (Ala. Crim.App.1999), aff'd, 777 So.2d 935 (Ala. 2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001). The trial court did not abuse its discretion in admitting the photographs into evidence. *1132 See, e.g., Samra v. State, 771 So.2d 1108, 1118-19 (Ala.Crim.App.1999).

V.
Stephens argues that the trial court erred to reversal when it refused to instruct the jury on the lesser-included offenses of murder and manslaughter with regard to the death of Nicholas Stephens.
The record indicates that the trial court instructed the jury on the law applicable to the charged capital offense  the murder of two or more people by one act or pursuant to one scheme or course of conduct. The court also charged the jury on the lesser-included offenses of intentional murder and manslaughter with regard to the death of Annie Lamb Stephens. At some point during the jury's deliberations, the jury sent a question to the trial court, asking, "Can we convict Stanley [Stephens] of the murder of Nick only?" The State noted that Stephens had been indicted for two capital offenses  the murder of two or more people by one act or pursuant to one scheme or course of conduct and the murder of a child less that 14 years of age. However, the State advised the court that it had elected to try the cases separately. Thus, the State maintained, charging the jury on any lesser-included offenses with regard to Nicholas Stephens could adversely impact the State's case with regard to the remaining capital-murder charge pending against Stephens. Defense counsel objected and requested that the jury be charged on the lesser-included offense of the intentional murder of Nicholas Stephens. However, counsel never specifically requested that the jury be charged on manslaughter as it pertained to Nicholas Stephens. After much discussion, the jury was brought out and reinstructed on the elements of the capital offense of murdering two or more people by one act or pursuant to one scheme or course of conduct. The trial court also advised the jury that it could not answer the question posed by the jury regarding whether Stephens could be convicted of murdering Nicholas Stephens. The jury then retired to resume deliberations, and it subsequently returned with a verdict finding Stephens guilty as charged in the indictment.
Stephens was not entitled to a charge on the intentional murder of Nicholas Stephens as a lesser-included offense of capital murder. A defendant is entitled to a charge on a lesser-included offense only if there is any reasonable theory from the evidence to support the charge. Ex parte Smith, 756 So.2d 957, 963 (Ala.2000). Because Nicholas Stephens was 9 years old at the time of his death, his murder was a capital offense pursuant to § 13A-5-40(a)(15), Ala.Code 1975. Thus, the trial court correctly refused to charge the jury on the lesser-included offense of intentional murder as it pertained to Nicholas Stephens because the law does not recognize such an offense.
The trial court likewise correctly refused to charge the jury on manslaughter as a lesser-included offense of capital murder as to Nicholas because the evidence did not support such a charge. Initially, we note that because defense counsel did not specifically object to the court's failure to instruct the jury on manslaughter as it pertained to Nicholas, we review this claim under the plain-error standard.
Stephens is correct in his assertion that where evidence of intoxication is presented the trial court must instruct the jury as to how this evidence relates to the intent to murder.
"A charge on intoxication should be given if `"there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt"' in the *1133 element of intent. Coon v. State, 494 So.2d 184, 187 (Ala.Cr.App.1986) (quoting Government of the Virgin Islands v. Carmona, 422 F.2d 95, 99 n. 6 (3d Cir. 1970)). See also People v. Perry, 61 N.Y.2d 849, 473 N.Y.S.2d 966, 966-67, 462 N.E.2d 143, 143-44 (App.1984) (`[a] charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis'). An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting, Owen v. State, 611 So.2d 1126, 1128 (Ala.Cr.App.1992); Crosslin v. State, 446 So.2d 675, 682 (Ala.Cr.App.1983), where the defendant denies the commission of the crime, Coon v. State, 494 So.2d at 187; see Moran v. State, 34 Ala.App. 238, 240, 39 So.2d 419, 421, cert. denied, 252 Ala. 60, 39 So.2d 421 (1949), and where the evidence of intoxication is offered by the State, see Owen v. State, 611 So.2d at 1127-28."
Fletcher v. State, 621 So.2d at 1019. Additionally, "`[w]hen the crime charged involves a specific intent, such as murder, and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter.'" Harper v. State, 629 So.2d 67, 69 (Ala. Crim.App.1993) (quoting Gray v. State, 482 So.2d 1318, 1319 (Ala.Crim.App.1985)).
What Stephens fails to comprehend, however, is what constitutes "evidence of intoxication" necessary to entitle a defendant to such an instruction. The Alabama Legislature has defined "intoxication" to include "a disturbance of mental or physical capacities resulting from the introduction of any substance into the body." § 13A-3-2(e)(1), Ala.Code 1975. Thus, evidence that the defendant ingested alcohol or drugs, standing alone, does not warrant a charge on intoxication. "[T]here must be evidence that the ingestion caused a disturbance of the person's mental or physical capacities and that that mental or physical disturbance existed at the time the offense was committed." Lee v. State, 898 So.2d 790, 838 (Ala.Crim.App.2001) (opinion on return to remand), cert. denied, 898 So.2d 874 (Ala.), cert. denied, 543 U.S. 924, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004). See also Maples v. State, 758 So.2d 1, 23 (Ala.Crim.App.), aff'd 758 So.2d 81 (Ala.1999). Such a holding is consistent with this Court's opinion in Windsor v. State, 683 So.2d 1027, 1037 (Ala.Crim.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), in which we stated:
"In this case, however, there was no evidence that the appellant was intoxicated. Although there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no `reasonable theory' to support an instruction on intoxication because there was no evidence of intoxication. There court did not err in not instructing the jury on intoxication and manslaughter where there was no evidence that the appellant was intoxicated at the time the robbery-murder occurred."
As previously noted, a defendant is entitled to a charge on a lesser-included offense only if there is any reasonable theory from the evidence to support the charge. Ex parte Smith, 756 So.2d at 963. However, the court should charge on voluntary intoxication only when there is a sufficient evidentiary foundation in the record for a jury to entertain a reasonable doubt as to the element of intent. Ex *1134 parte McWhorter, 781 So.2d 330, 342 (Ala. 2000).
Here, Stephens's "evidence of intoxication" comes from the testimony of his neighbor, Nathaniel Thomas, whose testimony established only that he saw Stephens out in his yard with a bottle of beer in his hand. Thomas offered no testimony indicating that Stephens was intoxicated. The testimony of Earnest Perry likewise fails to support a charge on manslaughter based on Stephens's intoxication. Perry testified merely that Stephens came to his house on the night of August 2, 1999, and that he asked for a drink of liquor and a cigarette "to calm his nerves." Quite simply, the testimony at trial failed to establish the "evidence of intoxication" necessary to justify an instruction on intoxication or the lesser-included offense of manslaughter based on Stephens's inability to form the requisite intent to commit capital murder. Thus, no basis for reversal on that ground exists.[4]

Penalty-Phase Issues

VI.
During the summer of 2002  at roughly the same time as Stephens was preparing for trial  the United States Supreme Court released Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)  two cases that dramatically impacted death-penalty cases throughout the United States. Because Stephens's case was not final when Ring was released, that decision is applicable to this appeal. See Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
In Ring, the United States Supreme Court applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases and held that "[c]apital defendants . . . are entitled to a jury determination on any fact on which the legislature conditions an increase in their maximum punishment." Ring, 536 U.S. at 589, 122 S.Ct. 2428.
Stephens argues that Apprendi and Ring require that the aggravating circumstances in a capital-murder case be set out in the indictment returned against him. Further, he argues, these decisions are consistent with well-established legal precedent mandating that the accused be provided notice of the facts upon which the State intends to rely at trial, particularly the aggravating circumstances it intends to establish. The State counters by arguing that Stephens's death sentence complies with applicable Alabama law and that nothing in Apprendi, Ring, or any other decision requires the State to include the aggravating circumstances in the indictment or to give an accused notice of the aggravating circumstances upon which the State intends to rely.[5]
Both this Court and the Alabama Supreme Court have held in several recent decisions that Ring does not invalidate Alabama's death-penalty statute, which vests the ultimate determination for the *1135 sentence in the hands of the trial judge  not the jury. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Duke v. State, 889 So.2d 1, 41 (Ala.Crim.App.2002) (opinion on return to remand), cert. granted, death sentence vacated pursuant to Roper v. Simmons, [543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005)] 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005); Turner v. State, 924 So.2d 737, 793 (Ala.Crim.App.2002); Stallworth v. State, 868 So.2d 1128, 1178 (Ala.Crim.App.2001) (opinion on return to second remand). In each of these cases, we recognized the narrowness of the holding in Ring, noting that "[t]he Ring Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt," while noting that the Ring Court "did not reach the question whether judicial sentencing or judicial override was constitutional." Stallworth v. State, 868 So.2d at 1183 (opinion on return to second remand).
Moreover, in the opinion on return to remand in Stallworth, 868 So.2d at 1178, we specifically rejected an argument virtually identical to Stephens's  namely, that "the indictment [against him] was void because it failed to include in the indictment the aggravating circumstances" that supported the capital offense. 868 So.2d at 1186. We rejected Stallworth's argument, holding that neither Ring nor Apprendi modified prior Alabama caselaw, "which holds that aggravating circumstances do not have to be alleged in the indictment." 868 So.2d at 1186. The indictment returned against Stephens in this case advised him of the crime with which he was charged  the capital offense of the murder of two or more people "by one act or pursuant to one scheme or course of conduct"  and set forth the elements of the offense that the State was required to prove. Because the indictment placed Stephens on notice that, if convicted of the charged offense he could be facing a potential death sentence, there is no merit to Stephen's contention that the State should have been required to include in the indictment all of the aggravating circumstances the State intended to prove at trial.
Likewise, neither Ring nor Apprendi requires that an accused be provided with advance notice of all the aggravating circumstances upon which the State intends to rely. Indeed, this Court has stated the following with regard to the other enumerated aggravating circumstances listed in § 13A-5-49 that are not elements of a capital offense:
"The aggravating circumstances enumerated in § 13A-5-49 that may lead to the imposition of the death penalty in a capital case are not elements of the offense and are not required to be set forth in the indictment. Dobard v. State, 435 So.2d 1338, 1347 (Ala.Cr.App. 1982), aff'd, 435 So.2d 1351 (Ala.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). A defendant has no right to advance notice of the state's intention to rely on any of the aggravating circumstances. Clark v. Dugger, 834 F.2d 1561, 1566 (11th Cir. 1987), cert. denied, 485 U.S. 982, 108 S.Ct. 1282, 99 L.Ed.2d 493 (1988); Knotts v. State, 686 So.2d 431 (Ala.Cr. App.[1995]); Ruffin v. State, 397 So.2d 277, 282 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981). The list of aggravating circumstances in § 13A-5-49 is exclusive and puts the defendant charged with a capital felony on notice of those circumstances against which the defendant may be required to defend. This statutory notice satisfies constitutional requirements."
*1136 Bush v. State, 695 So.2d 70, 87 (Ala.Crim. App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). Cf. Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997) (when an aggravating circumstance relied on by the State is an element of the capital offense it must be charged in the indictment).
Here, the jury in the guilt phase found Stephens guilty of capital murder. Stephens's case, however, differs from that of Waldrop, Hodges, Turner, and Stallworth because at the time Stephens committed these offenses, the fact that the defendant "intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct" did not, of itself, constitute an aggravating circumstance.[6] However, this fact does not require that Stephens's death sentence be set aside. Indeed, this Court recently upheld a death sentence imposed on a defendant who was convicted of the same capital offense as Stephens  the murder of two or more people pursuant to a common scheme or plan. Pilley v. State, 930 So.2d 550, 571 (Ala.Crim.App. 2005). In Pilley, we held that because the trial court had instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it first unanimously found the existence of at least one aggravating circumstance, and because the jury recommended by a vote of 10-2 that Pilley be sentenced to death, it was clear that the jury unanimously found the existence of at least one aggravating circumstance. In this case, however, the evidence is even stronger that the jury unanimously found the existence of at least one aggravating circumstance. Our review of the court's penalty-phase instructions indicates that the court instructed the jury on two aggravating circumstances it could consider: (1) that the defendant was previously convicted of a felony involving the use or threat of violence to the person pursuant to § 13A-5-49(2), Ala.Code 1975, and (2) that the capital offense was especially heinous, atrocious, or cruel, when compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975.[7] Further, the court instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it first unanimously found the existence of at least one aggravating circumstance. Additionally, the court supplied the jury with special interrogatory forms the jury was instructed to complete regarding whether it had unanimously found the existence of the aforementioned aggravating circumstances. The interrogatories indicate that the jury found the existence of both aggravating circumstances beyond a reasonable doubt. (Supp. C. 50-51.) Thus, it is clear that the jury unanimously found the existence of at least one aggravating circumstance. See Ex parte McNabb, 887 So.2d 998 (Ala.2004) (recognizing that even a nonunanimous recommendation of death by the jury proved that the jury, including the jurors who voted against the recommendation of death, had unanimously found the existence of a proffered aggravating circumstance, even though the circumstance was *1137 not included within the definition of the particular capital-murder offense charged in the indictment, because the trial court had specifically instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it had already unanimously agreed that an aggravating circumstance existed). Thus, no Ring violation is present in this case.

VII.
Stephens argues that Alabama's capital-sentencing procedure is unconstitutional. Specifically, Stephens contends that Ring prohibits Alabama's use of advisory jury verdicts in the penalty phase of a capital-murder trial. Thus, he claims, the trial court erred to reversal by instructing the jury that its verdict was advisory. Rejecting a similar claim in Duke v. State, 889 So.2d at 43 (Ala.Crim.App.2002) (opinion on return to remand), this Court noted:
"Duke also argues that Ring requires penalty-phase relief when the jury is told that its verdict is `advisory' or merely a `recommendation.' Contrary to Duke's contention, Ring does not address the advisory nature of a jury's sentencing recommendation. Duke's jury was properly informed that under Alabama law, its verdict was an advisory one. See § 13A-5-46, Ala.Code 1975. Thus, the jury was not misled regarding its role in the sentencing decision. See Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985); Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995), cert. denied, 516 U.S. 1120 (1996)."
Here, the trial court properly instructed the jury of its role under § 13A-5-46, Ala.Code 1975  taking care to emphasize the fact that its verdict was merely advisory did not absolve the jury of its responsibility in determining the appropriateness of the death sentence. Indeed, the court instructed the jury:
"The weighing and comparing of aggravating and mitigating circumstances require the exercise of good, sound judgment on your part. It is not a matter of unbridled discretion.
"A human life hangs in the balance. It is a matter of calm reflection, not for indulgence of emotion. You're to weigh the aggravating and mitigating circumstances and honestly and rationally evaluate the two options before you in light of those circumstances. Your verdict, as always, is based on the evidence."
(R. 1163.)
Our review of the record indicates that the trial court properly instructed the jury as to its role in the sentencing process under § 13A-5-46, Ala.Code 1975. The court's instructions did not run afoul of either Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), or Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). No basis for relief exists as to this claim.

VIII.
During the penalty phase of Stephens's trial, the trial court instructed the jury that it could consider three aggravating circumstances: (1) that Stephens murdered two or more people by one act or pursuant to one scheme or course of conduct, as had been found during the guilt phase; (2) that Stephens was previously convicted of another capital offense or a felony involving the use or threat of violence to the person; and (3) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses. The jury was instructed that its verdict finding Stephens guilty as charged in the indictment had proven beyond a reasonable doubt the existence of the aggravating circumstance that Stephens had murdered two or more people by one act or pursuant to one scheme or *1138 course of conduct. However, the court instructed the jury that it must unanimously agree that the two remaining aggravating circumstances had been proven beyond a reasonable doubt before those circumstances could be used in reaching an advisory verdict. The court further provided the jury with special interrogatories regarding the existence of those two aggravating circumstances. The jury found the existence of the two additional aggravating circumstances, and it recommended by a vote of 10-2 that Stephens be sentenced to death. The trial court accepted the jury's recommendation and on October 8, 2002, sentenced Stephens to death. That same day, Stephens filed a motion for a new trial.
On November 21, 2002, while Stephens's new-trial motion was pending, the State filed a motion for reconsideration of sentencing because one of the statutory aggravating circumstances presented during the penalty phase was not applicable. The State indicated that during the sentencing hearing the State had proven three aggravating circumstances. However, the State advised, one of the aggravating circumstances  that the defendant murdered two or more people by one act or pursuant to one scheme or course of conduct  did not officially become a statutory aggravating circumstance until September 1, 1999  approximately four weeks after Annie Lamb Stephens and Nicholas Lance Stephens were killed.
By agreement of the parties, all posttrial motions were continued, and both sides submitted briefs concerning the resentencing of Stephens. The trial court reviewed the parties' briefs and entertained oral arguments. At issue was the trial court's authority to reweigh the aggravating circumstances and the mitigating circumstances without convening a new jury for a revised advisory verdict. Ultimately, the trial court concluded that it was not necessary to convene a new jury. The court then entered a new comprehensive sentencing order in which it reweighed the two remaining aggravating circumstances against the finding of no mitigating circumstances, and again sentenced Stephens to death.
Stephens argues that the trial court committed reversible error in refusing to convene a new jury for the purpose of returning a new advisory verdict. Stephens cites the Alabama Supreme Court's decision in Ex parte Williams, 556 So.2d 744 (Ala.1987), in support of his claim. The State contends that Ex parte Williams is factually distinguishable from the instant case and that any error on the part of the trial court in refusing to convene a new sentencing jury was harmless.
In Ex parte Williams, the Supreme Court held that it is reversible error for a jury to consider an improper aggravating circumstance in making its sentencing recommendation; the improper aggravating circumstance considered by the jury in Ex parte Williams was that Williams was under sentence of imprisonment when he committed the capital offense. 556 So.2d at 745. The Court held that because the role of the jury in rendering an advisory verdict was equal to that of the trial court  the ultimate sentencing authority  the fact that the trial court concluded that there was no evidence to support the improper aggravating circumstance did not change the fact that the jury had considered facts that were not true. 556 So.2d at 745. Accordingly, the Supreme Court reversed Williams's death sentence and remanded the case for a new sentencing proceeding before a jury.
Ex parte Williams, however, involved a situation in which the jury considered facts that were not true. By contrast, the fact that Stephens murdered two or more people *1139 by one act or pursuant to one scheme or course of conduct was based on facts presented during the guilt phase of Stephens's trial  facts the jury found to exist beyond a reasonable doubt. Thus, Ex parte Williams is factually distinguishable from the case before us. Indeed, the facts before us are analogous to those in Edwards v. State, 515 So.2d 86, 93 (Ala.Crim. App.1987). In Edwards, this Court relied on the Supreme Court's decision in Ex parte Kyzer, 399 So.2d 330, 338-39 (Ala. 1981), to conclude that it was not error for a trial court "to include as an aggravating circumstance the fact that the defendant committed the crime of murder by intentionally murdering two persons pursuant to one scheme or course of conduct" despite the fact that, at the time of the offense, that circumstance was not included as a statutory aggravating circumstance in § 13A-5-49, Ala.Code 1975. Although a trial court may not impose a sentence of death unless at least one statutory aggravating circumstance is found to exist, a trial court does not err in considering the murder of two or more persons pursuant to a common scheme or plan as a "non-statutory aggravating circumstance" where a "statutory aggravating circumstance [necessary] to uphold the sentence of death [is] also present." Ponder v. State, 688 So.2d 280, 285 (Ala.Crim.App. 1996).
As set out above, after both sides were permitted to brief and argue the issue whether the trial court could reweigh the aggravating circumstances and mitigating circumstances and impose sentence on Stephens without convening a new jury, the trial court determined that it was authorized to reweigh the aggravating circumstances and the mitigating circumstances without disturbing the jury's advisory verdict. The trial court then entered a new sentencing order, setting forth the basis for its decision. The court's order provided, in pertinent part:
"In Ex parte Kyzer, 399 So.2d 330 [(Ala.1981)], the Supreme Court considered an issue similar to that in the Stephens case. At the time Kyzer was decided, the `killing of two or more persons' was a capital offense, and like Stephens, it was not an enumerated aggravator under then Section 13-11-6 of the Code of Alabama. The Court discussed aggravation in terms of a capital offense being a murder with aggravation and `aggravating circumstances' as being separately enumerated by statute. In the Kyzer case it was determined that the facts and circumstances did not qualify under [the] heinous, atrocious and cruel [aggravating circumstance]; and if the trial court upheld a death penalty decision, it would be based on aggravation averred in an indictment as opposed to an aggravating circumstance enumerated. The Court concluded in Kyzer, `If Kyzer is convicted of the capital offense, the jury and the trial judge at the sentencing hearing may find the "aggravation" averred in the indictment as the "aggravating circumstance," even though the "aggravation" is not listed in Section 13-11-6 as an "aggravating circumstance." The jury or trial judge, as applicable, will weigh the "aggravation" or "aggravating circumstance" against any mitigating circumstances in determining whether to impose a sentence of death.' In Edwards v. State, 515 So.2d 86 (Ala.Cr.App.1987), the Court of Criminal Appeals referenced the Kyzer finding that the `aggravation' averred in the indictment may be considered as the `aggravating circumstance' even though not enumerated in § 13A-5-49, Code of Alabama 1975. In footnote 3, [the Court] also points out that `Section 13-11-6 under the 1975 capital murder statute and the present Section 13A-5-49 *1140 are virtually identical.' Therefore, with regard to Ex parte Kyzer and Edwards v. State, if the Court relief on those cases solely, no resentencing would be required.
"However, with the extreme caution that must be observed when reviewing potential error in a penalty phase of a capital proceeding, this Court has taken the following approach concerning the Stephens case recognizing any decision this Court makes is based on the facts and circumstances surrounding this defendant, his background, his particularized crime and with the `twin objectives' of measured, consistent application of sentencing and fairness to the accused.
"This Court first applied the `harmless error rule,' recognizing that in a capital case it must be applied with extreme caution, and not applied in an automatic or mechanical fashion. In that regard, this Court considered that if it were error to consider the invalid aggravator, whether beyond a reasonable doubt the result would have been the same had the aggravating circumstance not been considered by the jury. It is the opinion of this Court that no rational jury, properly instructed, would have found otherwise. The jury had two additional aggravating circumstances before them. First, that Stephens had previously committed and was convicted of a crime of violence against one of the victims by shooting her with a shotgun. The other aggravating circumstance was that the now convicted capital offense was especially heinous, atrocious, [or] cruel when compared to other capital offenses. In my findings that follow within this order it will be overwhelmingly apparent that the nature of the crimes committed by Stephens were so heinous, atrocious, [or] cruel that this aggravator was and remains the driving force in the weighing process. Additionally, this Court has looked to other cases which have been affirmed by the Courts as `conscienceless or pitiless and unnecessarily torturous' and compared the facts from those cases with [Stephens's] actions in this matter. See Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981); Ex parte Waldrop, [859 So.2d 1181 (Ala.2002)]; Hocker v. State, [840 So.2d 197 (Ala. Crim.App.2002)]; Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000); Price v. State, 725 So.2d 1003 (Ala. Crim.App.1997); Barbour v. State, 673 So.2d 461 (Ala.Crim.App.1994); McNair v. State, 653 So.2d 347, 349 [(Ala.Crim. App.1993)] (see also Court findings below). This Court further finds precedent that harmless error of presenting an invalid aggravator did not render a defendant's sentence fundamentally unfair. Lawhorn v. State, 581 So.2d 1159 (Ala.Cr.App.1990).
"This Court, when applying the harmless-error analysis, did so by looking at the entire trial record and, if error occurred, it was harmless beyond a reasonable doubt. This Court was present for all proceedings before the Jury, was able to personally view the demeanor of witnesses, and understand the contextual nature of the activities. This Court is better equipped to consistently and fairly reweigh the aggravating and mitigating factors.
"An additional consideration by this Court is the guidance provided by the Supreme Court of Alabama in Ex parte Waldrop, [859 So.2d 1181 (Ala.2002)]. The Alabama Supreme Court discussed Ring v. Arizona, 122 S.Ct. 2428 (2002) and Apprendi v. New Jersey, 530 U.S. 466(200), and its relationship to Alabama capital sentencing requirements. Within that opinion the Court indicated `only one aggravating circumstance must exist *1141 in order to impose the sentence of death. . . . Thus in Waldrop's case, the jury, and not the trial judge, determined the existence of the "aggravating circumstance necessary for the imposition of the death penalty." Therefore, the findings reflected in the jury's verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi require.' Ex parte Waldrop.

"In Stephens, the jury had found the defendant guilty of the intentional murder of two persons. However, in light of Ring, Apprendi, and their progeny, this Court submitted additional special interrogatories for the jury to determine beyond a reasonable doubt the existence or not of two additional aggravating circumstances: (1) previously convicted of a felony involving the use or threat of use of violence to the person (Exhibit A), and (2) the capital offense committed by Stephens was especially heinous, atrocious, or cruel compared to other capital offenses. (Exhibit B). Consistent with Ring and Apprendi, the jury found beyond a reasonable doubt facts that resulted in an increase in the defendant's authorized punishment or exposed him to a greater punishment. This Court is satisfied that the Stephens jury found two aggravating factors that exposed the defendant to the death penalty and therefore the requirements of Ring and Apprendi are met."
(Supp. C. 40-42.)
We have carefully reviewed the record before us. Although the jury was permitted to consider a nonstatutory aggravating circumstance in rendering its advisory verdict, we conclude that there is no reason to set aside the trial court's sentence of death and remand this case for a new sentencing proceeding. As this Court stated in Lawhorn v. State, 581 So.2d 1159 (Ala.Crim. App.1990), aff'd 581 So.2d 1179 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991):
"Although we consider the jury's finding of the aggravating circumstance to be invalid because it was not guided by sufficient instruction, we find no imperative to reverse and remand this cause for resentencing. In Clemons v. Mississippi, 494 U.S. 738, 741, 110 S.Ct. 1441, 1441, 108 L.Ed.2d 725 (1990), the Court held that `the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on invalid or improperly defined aggravating circumstances either by reweighing of the aggravating and mitigating evidence or by harmless error review.'
"Our supreme court held, in Ex parte Williams, 556 So.2d 744 (Ala.1987), that the trial court, upon its finding that an aggravating circumstance on which the jury was instructed was invalid, cannot cure such error by disregarding that circumstance and finding, upon reweighing, that the remaining aggravating circumstances outweigh the mitigating evidence. In Williams, the jury had been improperly instructed that it could consider the fact that the capital offense was committed by a person under sentence of imprisonment, § 13A-5-49(1); however, it was subsequently established that the appellant was not on probation or parole at the time the crime was committed. In holding that the sentence of death could not be affirmed, our supreme court reasoned as follows:
"`The Court of Criminal Appeals reasoned that, because the trial court, as the ultimate sentencing authority, did not consider illegal evidence ("the incorrect aggravating circumstance") in the sentencing hearing, the trial *1142 court's error in permitting the jury to consider such evidence in arriving at its recommendation of the death sentence was harmless. The basic flaw in this rationale is that it totally discounts the significance of the jury's role in the sentencing process.
"`The legislatively mandated role of the jury in returning an advisory verdict, based upon its consideration of aggravating and mitigating circumstances, can not be abrogated by the trial court's errorless exercise of its equally mandated role as the ultimate sentencing authority. Each part of the sentencing process is equally mandated by the statute (§§ 13A-5-46, -47(e)); and the errorless application by the court of its part does not cure the erroneous application by the jury of its part. For a case consistent with our holding, see Johnson v. State, 502 So.2d 877 (Ala.Cr.App.1987). To hold otherwise is to hold that the sentencing role of the jury, as required by statute, counts for nothing so long as the court's exercise of its role is without error.
"`We emphasize that our holding that the Court of Criminal Appeals erred in its application of the harmless error rule is based upon independent state law grounds and upon statutory construction. We reverse as to the judgment of sentence and remand to the Court of Criminal Appeals with instructions to remand this cause for a new sentencing hearing before a jury and before the court as required by law.'
"Id. at 745 (emphasis in original).
"In consideration of this rationale, we presume that this court, in reviewing the propriety of a death sentence after a jury recommendation based, in part, on an invalid aggravating circumstance, cannot resort to the first analysis recognized by the Maynard Court: a reweighing, by the appellate court, of the valid aggravating and the mitigating circumstances.
"However, we find no impediment to prevent us from reviewing the insufficient instruction for harmless error. The Clemons Court, in discussing this alternative stated the following:
"`Even if under Mississippi law, the weighing of aggravating and mitigating circumstances were not an appellate, but a jury function, it was open to the Mississippi Supreme Court to find that the error which occurred during the sentencing proceeding was harmless. See, e.g. Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792 [100 L.Ed.2d 284] (1988). As the plurality in Barclay v. Florida, [463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983)], opined, the Florida Supreme Court could apply harmless error analysis when reviewing a death sentence imposed by a trial judge who relied on an aggravating circumstance not available for his consideration under Florida law:
"`"Cases such as [those cited by the petitioner] indicate that the Florida Supreme Court does not apply its harmless-error analysis in an automatic or mechanical fashion, but rather upholds death sentences on the basis of this analysis only when it actually finds that the error is harmless. There is no reason why the Florida Supreme Court cannot examine the balance struck by the trial judge and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance. . . . `What is important is an individualized determination on the basis of the character of *1143 the individual and the circumstances of the crime.' Zant [v. Stephens, 462 U.S. 862,] 879[, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983)] (emphasis in original). Id., [463 U.S.] at 958, 103 S.Ct., at 3429."'
"494 U.S. at 753, 110 S.Ct. at 1450.
"In Alabama, `the harmless error rule does apply in capital cases at the sentence hearing.' Ex parte Whisenhant, 482 So.2d 1241, 1244 (Ala.1983). However, it `is to be applied with extreme caution in capital cases,' and this caution must be observed when reviewing error in the penalty phase, for `[a]fter all, it is the penalty which distinguishes these cases from all other cases.' Ex parte Whisenhant, 482 So.2d 1247, 1249 (Ala. 1984).
"To determine whether the trial court's failure to instruct properly was harmless error, the Clemons Court suggests one of two inquiries: (1) whether beyond reasonable doubt the sentence would have been the same had the `especially heinous' circumstance not been considered by the jury at all, or (2) whether beyond reasonable doubt the result would have been the same had the circumstance been properly defined in the jury instructions. See also Henry v. Wainwright, 721 F.2d 990, 995 (5th Cir. 1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984) (wherein the court, in holding harmless the trial court's failure to instruct that aggravating circumstances must be found beyond a reasonable doubt, stated that `[f]or the failure to give the instruction to be harmless, the evidence must be so overwhelming that the omission beyond a reasonable doubt did not contribute to the verdict').
". . . .
"We note that this situation does not involve the jury's consideration of misleading, inaccurate, or illegal information or evidence. Rather, it is a case where the aggravating circumstance, overwhelmingly supported by admissible evidence, was rendered invalid because it was unconstitutionally presented to the jury. We find that the jury's improper consideration of this aggravating circumstance and possibly improper consideration by the trial court did not render appellant's sentencing fundamentally unfair. It is unnecessary to vacate appellant's sentence because we are convinced beyond a reasonable doubt that, had the circumstances been properly narrowed, the jury would have recommended the same sentence and the trial court would have imposed the same sentence. We hold this, even in the face of our recognition of the utmost importance of insuring that a death sentence not be based on arbitrary and capricious action. While we, in theory, would be very hesitant to find harmless error in the submission to the jury of an unconstitutionally defined aggravating circumstance, we find that the facts of this case support such an application beyond a reasonable doubt."
581 So.2d at 1175-77 (footnotes omitted).
Additionally, the United States Supreme Court has held that in order for a state appellate court to affirm a death sentence after the sentencer was instructed to consider an invalid aggravating circumstance, that court must determine what the sentencer would have done absent the factor; otherwise, the defendant is deprived of the precision that individualized consideration under the Eighth Amendment demands. Stringer v. Black, 503 U.S. 222, 230-32, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). Applying Stringer v. Black, the United States Court of Appeals for the Seventh Circuit has held that when an "invalid" aggravating circumstance *1144 is considered for purposes of capital sentencing in a "weighing" state (such as Alabama), a state appellate court must either reweigh the aggravating circumstances against the mitigating circumstances, engage in a meaningful harmless-error analysis, or remand for resentencing. Hough v. Anderson 272 F.3d 878, 904-06 (7th Cir.2001).
As required by § 13A-5-53(b)(2), Ala.Code 1975, this Court is required to independently reweigh the aggravating circumstances and the mitigating circumstances to determine whether death was the appropriate sentence. See Part X of this opinion. Nevertheless, we will also review this matter using a harmless-error analysis.
Utilizing the first inquiry in Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), we conclude that there is no question that had the jury not been charged on the invalid aggravating circumstance that "[t]he defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct," § 13A-5-49(9), Ala.Code 1975, it would have still recommended beyond a reasonable doubt that Stephens be sentenced to death. As noted in the trial court's detailed sentencing order, the jury unanimously found the existence of two other aggravating circumstances: that Stephens had previously been convicted of a violent felony against one of the victims in this case  Annie Lamb Stephens, see § 13A-5-49(2), and that the capital offense was "especially heinous, atrocious, or cruel when compared to other capital offenses." See § 13A-5-49(8).
In addition to the invalid aggravating circumstance, the jury also unanimously found beyond a reasonable doubt the existence of the two remaining aggravating circumstances. The evidence indicated that in 1992, following an argument, Stephens shot Annie Lamb Stephens with a shotgun, hitting her in the face and chest with shotgun pellets. As a result of this incident, Stephens was charged with attempted murder, but pleaded guilty to the lesser-included offense of second-degree assault. A further review of the evidence indicates that the capital offense committed here was "especially heinous, atrocious, or cruel when compared to other capital offenses." As previously stated, Stephens stabbed each of his victims more than 30 times, leaving a crime scene covered in blood. Moreover, the victims were aware not only of their own impending death, but were also aware of each other's impending death. Thus, Annie Lamb Stephens not only died a violent death at the hands of her estranged husband, she no doubt experienced a mother's anguish, by either witnessing her son's death at his father's hand or knowing that her nine 9-year-old son was about to die at his father's hand. Given these circumstances, we are convinced that the jury's consideration of the invalid aggravating circumstance was harmless beyond a reasonable doubt.
Stephens also makes a somewhat disjointed argument that it was error for the trial court to submit special interrogatory forms regarding the aggravating circumstances set forth in § 13A-5-49(2) (previous conviction of a crime of violence) and § 13A-5-49(8) (offense was especially heinous, atrocious, or cruel). Given the Alabama Supreme Court's recent decision in Ex parte McGriff, 908 So.2d 1024 (Ala. 2004), authorizing the prospective use of penalty-phase special interrogatory forms, this claim is without merit.
Based on the foregoing, any error by the trial court in resentencing Stephens without convening a new sentencing jury was harmless beyond a reasonable doubt.

*1145 IX.
In Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the United States Supreme Court held that execution of a mentally retarded defendant violates the Eighth Amendment's prohibition against cruel and unusual punishment. That Court did not define a legal standard for mental retardation, but left the definition of the term and the enforcement of the newly announced rule to the states. The Alabama Legislature has yet to enact a statute addressing the holding in Atkins. The only Alabama statute that provides assistance in making this determination is § 15-24-2(3), Ala.Code 1975, which defines a "mentally retarded person" as "[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments."
The Alabama Supreme Court in Ex parte Perkins, 851 So.2d 453 (Ala.2002), in determining whether Perkins was mentally retarded and therefore not subject to execution, applied the broadest definition of mental retardation recognized in those states that prohibit the execution of the mentally retarded. The Court stated:
"Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significant subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)."
851 So.2d at 456.
Here, the record indicated that Stephens had a verbal IQ of 73 and a performance IQ of 86, for a full-scale IQ of 77. During the trial and sentencing hearing, it was noted that Stephens had completed high school and that he subsequently obtained a commercial driver's license and had successfully performed as a qualified truck driver. The Court noted that based on Stephens's school history and subsequent work performance, Stephens was able to function satisfactorily in society. The record indicates that Stephens did not suffer significant deficits in his adaptive behavior. To the contrary, he was employed, he was married, and he fathered three children, and according to defense witnesses, he was a caring father.
Considering all of the evidence in the record before us and applying the broad definition of mental retardation set forth by the Alabama Supreme Court in Ex parte Perkins, we conclude that Stephens is not mentally retarded. Therefore, Atkins does not preclude imposition of the death sentence in this case. See also Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___, ___ (Ala.2003); Adams v. State, 955 So.2d 1037, 1102 (Ala. Crim.App.2003).

X.
As required by § 13A-5-53, Ala.Code 1975, we will now address the propriety of Stephens's death sentence.
Stephens was indicted and convicted of murdering two or more people "by one act or pursuant to one scheme or course of conduct." § 13A-5-40(a)(10), Ala.Code 1975. The jury, by a vote of 10-2, recommended that Stephens be sentenced to death.
The record reflects that Stephens's sentence was not imposed under the influence of passion, prejudice, or any *1146 other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances and mandated that Stephens be sentenced to death. The court's February 11, 2003, sentencing order found the existence of two aggravating circumstances: (1) that the defendant had been previously convicted of another capital offense or of a felony involving the use of or threat of violence to the person, pursuant to § 13A-5-49(2), Ala.Code 1975; and (2) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The trial court found the existence of none of the mitigating circumstances enumerated in § 13A-5-51, Ala. Code 1975, specifically referencing each of the seven statutory mitigating circumstances enumerated in § 13A-5-51. The court found the existence of no nonstatutory mitigating circumstances, as provided for in § 13A-5-52, Ala.Code 1975.
The trial court's finding that the aggravating circumstance that the murder was committed after Stephens had been previously convicted of another capital offense or of a felony involving the use or threat of violence to the person is supported by the evidence. The State presented evidence indicating that in 1992 Stephens had been convicted of second-degree assault after he fired a shotgun at Annie Lamb Stephens, striking her in the face and chest. See Smith v. State, 698 So.2d 189, 212 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997) (previous conviction for felony assault is encompassed in § 13A-5-49(2)). The trial court found as aggravating circumstance that the murders were "especially heinous, atrocious, or cruel compared to other capital offenses." See 13A-5-49(8), Ala.Code 1975. The court's finding that the victims' murders were especially heinous, atrocious, or cruel was predicated on the fact that
"[B]oth victims suffered in excess of 30 stab or cut wounds to their bodies. Furthermore, Annie Stephens was found with her buttocks upon a cushion, her legs spread, and without any panties. A belt was found wrapped round the neck of Annie Stephens, and Dr. Wanger testified that she had suffered bruising and abrasions to the face. The Doctor testified that in his opinion the bruising and abrasions occurred prior to the death of the victim. It was apparent that one or both victims had to not only endure the vicious stabbing and violence associated with their individual assault but it was possible that one or both had to witness the injury, attack, and/or death of the other. Therefore, the evidence in this case clearly supports the capital offense was especially heinous, atrocious, and cruel compared to other capital offenses."
(Supp. C. 45-46.)
In Taylor v. State, 808 So.2d 1148 (Ala. Crim.App.2000), aff'd, 808 So.2d 1215 (Ala. 2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002), we addressed the application of this aggravating circumstance. We find the following language to be particularly relevant to this case:
"The Alabama appellate courts' interpretation of `especially heinous, atrocious, or cruel' has passed muster under the Eighth Amendment because those courts have consistently defined the term to include only `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Ex parte Clark, [728 So.2d 1126 (Ala.1998)], citing, Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989). The *1147 Alabama appellate courts have considered the infliction of psychological torture as especially indicative that the offense was `especially heinous, atrocious or cruel.' Thus, the mental suffering where a victim witnesses the murder of another and then realizes that soon he or she will also be killed, has been found to be sufficient to support a finding of this aggravating circumstance. Norris v. State, 793 So.2d 847, 854 (Ala. Cr.App.1999). As the trial judge pointed out in his sentencing order, two of the victims here witnessed Taylor kill another victim. Both tried to run and hide, but were captured. Both begged and pleaded for their lives; one offering money and property, the other pleading for the sake of her children. Both were deliberately and methodically executed with a gunshot to the head as they pleaded for their lives. These murders were not accomplished in a rapid-fire manner; there was sufficient time between the three murders for the next victim to be placed in significant fear for his or her life, and the evidence is clear that each was well aware of what was about to happen."
808 So.2d at 1169.
Here, just as in Taylor, there was sufficient time between the murders for the remaining victim to realize his or her own fate. Certainly, Annie would have suffered mental anguish upon realizing that Stephens intended to kill not only her but also their nine-year-old son, Nicholas. Nicholas would have likewise suffered mental anguish upon witnessing his mother's death, and the realization that he, too, was about to die. Given these circumstances, the trial court properly concluded that the murder of the two victims was "especially heinous, atrocious, or cruel." See Ex parte Clark, 728 So.2d 1126, 1140 (Ala.1998). The trial court's finding that no statutory mitigating circumstances or nonstatutory mitigating circumstances existed is also supported by the record. We agree with the trial court's finding that death was the proper sentence in this case.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to independently weigh the aggravating and mitigating circumstances to determine the propriety of Stephens's death sentence. Stephens brutally murdered his estranged wife and nine-year-old son, stabbing each of them more than 30 times and inflicting wounds that penetrated virtually every vital organ, and slitting his son's throat. Additionally, Stephens beat and choked his wife by fastening a belt around her neck. Both victims died, aware not only of their impending death, but also that a family member would also die. We can imagine fewer more horrifying scenarios than a mother facing death, knowing that her child will also die. After independently weighing the aggravating circumstances and the mitigating circumstances, we find that the death sentence is appropriate in this case.
As required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether Stephens's death sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. Stephens murdered two individuals pursuant to a common scheme or plan. Similar crimes have been punished by death on numerous occasions. See, e.g., Pilley v. State, 930 So.2d 550 (Ala.Crim.App.2005) (five deaths); Miller v. State, 913 So.2d 1148 (Ala.Crim.App.), opinion on return to remand 913 So.2d at 1154 (Ala.Crim.App. 2004) (three deaths); Apicella v. State, 809 So.2d 841 (Ala.Crim.App.2000), aff'd, 809 So.2d 865 (Ala.2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 706 (2002) (five deaths); Samra v. State, 771 So.2d 1108 (Ala.Crim.App.1999), aff'd, 771 So.2d 1122 (Ala.), cert. denied, 531 U.S. 933, 121 *1148 S.Ct. 317, 148 L.Ed.2d 255 (2000) (four deaths); Williams v. State, 710 So.2d 1276 (Ala.Crim.App.), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998) (four deaths); Taylor v. State, 666 So.2d 36 (Ala.Crim. App.), on remand, 666 So.2d 71 (Ala.Crim. App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996) (two deaths); Siebert v. State, 555 So.2d 772 (Ala.Crim. App.), aff'd, 555 So.2d 780 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990) (three deaths); Holladay v. State, 549 So.2d 122 (Ala.Crim.App. 1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989) (three deaths); Fortenberry v. State, 545 So.2d 129 (Ala.Crim. App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990) (four deaths); Hill v. State, 455 So.2d 930 (Ala.Crim.App.), aff'd, 455 So.2d 938 (Ala.), cert. denied, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984) (three deaths).
Finally, as required by Rule 45A, Ala. R.App.P., we have searched the record for any error that may have adversely affected Stephens's substantial rights and have found none. Stephens's conviction and sentence of death for the murders of Annie Lamb Stephens and Nicholas Lance Stephens are due to be, and are hereby, affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.
NOTES
[1] Sherrie Stephens identified Carman as her younger sister, but never stated her exact age.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] We note that the Supreme Court has reversed a defendant's conviction for capital murder on the ground that evidence of the defendant's domestic abuse toward his wife violated the rule against hearsay, not that the evidence was inadmissible pursuant to Rule 404(b), Ala.R.Evid. Ex parte Baker, 906 So.2d 277 (Ala.2004). However, Ex parte Baker is factually distinguishable to this case, in that, unlike Ex parte Baker, evidence of Stephens's assault on Annie was established by direct evidence, the certified copy of his 1992 guilty-plea conviction, as opposed to hearsay evidence of the kind elicited from witnesses at Baker's trial, recounting the victim's out-of-court declarations purporting to describe acts of domestic violence against her by Baker.
[4] Given the scant evidence of Stephens's intoxication, we question the trial court's decision to instruct the jury on intoxication and on the lesser-included offense of manslaughter as it pertained to Annie Lamb Stephens. However, because Stephens received more favorable jury instructions than he was entitled to, any error in the giving of that instruction was harmless.
[5] Because Ring specifically applies the legal principles set out in Apprendi to death-penalty cases, we will couch our discussion of Stephens's claims in terms of what Ring, rather than Apprendi, requires.
[6] Section 13A-5-49, Ala.Code 1975, was amended, effective September 1, 1999, to make the death of two or more persons by one course of conduct an aggravating circumstance. See § 13A-5-49(9), Ala.Code 1975.
[7] We note that the trial court incorrectly instructed the jury that it could consider as an aggravating circumstance the fact that the defendant intentionally caused the death of two or more people pursuant to a common scheme or plan, since this aggravating circumstance did not become effective until after the date on which Stephens killed Annie and Nicholas. The effect of the court's error will be discussed in Part VIII of this opinion.